Gene **BURNS** and Edward Sattler, Plaintiffs,

v.

**THE WARWICK VALLEY CENTRAL SCHOOL DISTRICT, Dr. Joseph Natale, John Niedzielski and V. Louise Lynch, Defendants.**

**No. 00 CIV. 6638(CM).**

United States District Court, S.D. New York.

Oct. 3, 2001.

MEMORANDUM DECISION AND OR-DER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDG-MENT AND DENYING PLAIN-TIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs Gene Burns and Edward Sattler seek a declaratory judgment that defendants Warwick Valley Central School District ("the District"), Dr. Joseph Natale, John Niedzielski, and V. Louise Lynch, violate the Free Exercise and Establishment Clauses of the First Amendment of the U.S. Constitution, the Equal Protection provisions of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and New York State Executive Law § 296, by

making an inquiry into religious tenets of employees' religions before granting "personal" days. The plaintiffs also seek a permanent injunction to prevent defendants from engaging in such inquiries in the future.

Plaintiffs and defendants cross-move for summary judgment. Defendants' motion is granted.

## STIPULATED FACTS

The following facts come from the Stipulation of Agreed Facts signed by attorneys for plaintiffs and defendants, and submitted with this Court.

Plaintiffs Gene Burns and Edward Sattler are teachers employed by the Warwick Valley Central School District ("the District"). At all times relevant to this action, defendant Dr. Joseph Natale was the Superintendent of the Warwick Valley Central School District; defendant John Niedzielski was the Associate Superintendent for Administration and Personnel of the District; and defendant V. Louise Lynch was the Principal of the Warwick Valley High School.

From approximately 1994 to the present, Burns was the First Vice President of the Warwick Valley Teachers Association ("the Union"), and negotiated the terms of a Collective Bargaining Agreement ("the CBA") with the District, which became effective on July 1, 1998, and continues in effect through June 30, 2003.

### 1. Old Policy

According to the Stipulated Facts submitted by the parties, Article XVIII(E) of the CBA governs the application for and granting of personal leave days for teachers employed by the District. However, the document provided to the Court, titled "Collectively Negotiated Agreement, Warwick Valley Central School District and Warwick Valley Teachers Association, July 1, 1998 through June 30, 2003," indicates that provision appears in Article XVIII(D).[1] It states, in pertinent part:

Absences will be granted, with full pay, up to a maximum of three (3) days per year under the following provisions:

1. Two (2) days for which no reasons need to be given, upon five (5) days prior approval by the Superintendent or his/her designee, except in emergencies where the Principal or his/her designee gives approval.

2. One (1) day, upon five (5) days prior approval by the Superintendent or his/her designee, for which a specific reason must be given and as to which there is a conflict in time between working hours and the purpose of the leave. The following is an illustrative list, but not totally inclusive, of approved reasons for personal leave: (a) court hearings; (b) IRS audit; (c) house closing; (d) adoption interview; (e) medical attention; (f) educational interview; (g) conferences; (h) funerals not covered by bereavement leave; (i) lobbying; (j) graduation; and (k) Title VII CRA accommodation.

3. Personal leave shall not be taken immediately prior to or following vacation, holidays or long weekends, with the exception of Title VII accommodation days and days upon which an individual is subpoenaed to a legal proceeding. A copy of the subpoena must be presented to the appropriate supervisor for this requirement to be waived.

In addition to the leave provision above, personal leave will be granted for up to two (2) days, with the individual

---

1. Section XVIII(E) provides only that: "Absence with pay will be allowed for trips involving school business and professional meetings. Approval by the Superintendent for such trips is required." For the purposes of this opinion, I will continue to refer to this section as the parties do—Article XVIII (E).

being paid his/her salary minus a reimbursement deduct of the cost of a substitute, *for the purposes of Title VII CRA accommodation where there is a conflict between working hours and the Title VII CRA protected right.* Such leave will be subject to the notice requirement set forth in paragraph "1", above. These days may not be added to a teacher's unused accumulated sick leave. . . .

(Stip. Facts at Ex. A.) (emphasis added)

### 2. *Denials of Title VII Accommodation Days Under the Old Policy*

Plaintiff Burns professes to be a devout, practicing Catholic, and believes that he should not work on Catholic Holy Days of Obligation. There are three Holy Days of Obligation that ordinarily fall on school days: All Saints Day (November 1), The Feast of the Immaculate Conception (December 8), and Ascension Thursday (forty days after Easter).

On April 20, 1999, Burns filed a "Request for Excused Absence" for May 13, 1999, pursuant to the CBA. The reason stated in his request was "Title VII (Ascension Thursday)."

By memo dated April 26, 1999, Niedzielski asked Burns for additional information related to his request, stating that he, Niedzielski, was unaware of a conflict between working hours and his Title VII C.R.A. protected right. In response to Niedzielski's memo, Burns provided him with a copy of the catechism of the Catholic Church pertaining to Sundays and Holy Days of Obligation.

By memo dated May 11, 1999, Niedzielski informed Burns that after reviewing the catechism, he did not see a conflict between working hours and the Title VII accommodation. On May 13, 1999, Burns provided Natale and the members of the District's Board of Education with a letter informing them that he was working under protest because he was being denied his civil rights to practice his faith. Burns' grievance was referred to arbitration, pursuant to the CBA.

On September 23, 1999, Burns again filed a "Request for Excused Absence" for November 1, 1999, the stated reason being "Title VII, Holy Day of Obligation." This request was denied by a memo from Lynch dated September 28, 1999.

Plaintiff Sattler professes to be a devout, practicing Episcopalian and believes that he should not work on certain Christian Holy Days. On November 2, 1999, Sattler filed a "Request for Excused Absence" pursuant to the Agreement for December 8, 1999, for observance of the Christian Holy Day of the "Immaculate Conception." On November 3, 1999, the District denied Sattler's request.

### 3. *Burns Arbitration and New Policy*

On September 1, 2000, the arbitrator handed down an Arbitration Award in a proceeding between the defendant District and the Union. This award was based upon the grievance filed by Burns and another employee, concerning the District's denial to them of a paid personal leave day under the Agreement for Ascension Thursday ("Burns Award"). The arbitrator concluded that the District violated Article XVIII(E) by denying Burns' request for personal leave. He affirmed an earlier Arbitration Award, saying that the District could make a "reasonable, albeit discreet inquiry as to whether leave taken as a Title VII accommodation day was necessary because there existed a conflict between the employee's working hours and the Title VII C.R.A. protected right." He added, in part:

> While it is true that [Burns and Burke] could have observed the formal practices of their religion outside of their work day, full observance required that they be absent from school on Ascension

Thursday.... A practice does not have to be specifically required or forbidden by an employee's religion to be protected.... This finding should not be misinterpreted as opening the floodgates to indiscriminate use of personal leave for Title VII purposes.... Thus, for example, if it could be shown that either Burns or Burke spent Ascension Thursday in activities inconsistent with need to refrain from working and to observe the sanctity of the day (e.g. by pursuing a second job or engaging in physical or mental activities akin to working), they would not be entitled to Ascension Thursday as a Title VII accommodation day. However, no such evidence exists in the record.

(Stip. of Agreed Facts. at Ex. L.)

On September 1, 2000, the day the Burns Award was handed down, Burns filed his complaint in this action. After the Burns Award and the filing of this action, the District changed its practice to eliminate the requirement that the applicant demonstrate that absence from work was mandated by his religion. Under the new policy: "[I]n all instances in which applicants of any professed religious faith or belief request a paid personal day under the Agreement's provisions for Title VII C.R.A. accommodation, the defendant District reserves the right to interview the applicants concerning whether they hold a bona fide personal religious belief requiring their absence from employment on the day in question, but will grant such leave so long as the applicant professes a genuine personal belief in this regard." (Def. Answer ¶ 6.)

### 4. Handling of Requests Under the New Policy

On September 28, 2000, Burns filed a Request for Excused Absence for November 1, 2000, pursuant to the Agreement, identifying the request as for "Title VII C.R.A. (All Saints Day)." On October 12, 2000, defendant Niedzielski, on behalf of the District, granted Burns' request.

On October 13, 2000, District teacher Edmund T. Burke filed a Request for Excused Absence for November 1, 2000, pursuant to Article XVIII(E), identifying the request as for "Title VII C.R.A. Accommodation." He did not identify the religious significance of the day. On October 16, 2000, by memo of that date to Burke, Niedzielski asked Burke to provide him "with additional information related to your request for that date [November 1, 2000] so that I may review it with respect to the Title VII C.R.A. protected right." (Stip. of Agreed Facts at Ex. P.) On October 24, 2000, Burke advised Niedzielski that "November 1, 2000 is All Saints Day, a holy Day of obligation in the Roman Catholic calendar." (Id. at Ex. Q.) Niedzielski granted Burke's request, noting: "All Saints Day, a holy day of obligation in the Roman Catholic Calendar, as per attached note from Mr. Burke." (Id. at Ex. P.)

On November 27, 2000, Sattler filed a Request for Excused Absence for December 8, 2000, pursuant to Article XVIII(E) of the CBA, without further information. On November 29, 2000, Lynch indicated to Sattler that the District would return the Request for Excused Absence unless it were more detailed. Accordingly, Sattler added to the Request, "Feast of Immaculate Conception."

On December 4, 2000, defendant Niedzielski questioned Sattler about his Request for Excused Absence by asking Sattler the following two questions: "What is your religion?" and "What are the religious requirements of the day?" Sattler told Niedzielski that he was uncomfortable responding to this inquiry, and Niedzielski informed Sattler that the School District "reserves the right to inquire" pursuant to the arbitrator's ruling and suggested that

Sattler consider the questions posed to him. Sattler indicated to Niedzielski that he would provide a written response.

Before Sattler responded, Niedzielski provided him with a memorandum dated December 7, 2000, which stated:

As per our discussion on Monday, December 4, 2000 regarding your request for a personal day (received in my office November 30, 2000) on Friday December 8, 2000 (Title VII Accommodation, Feast of Immaculate Conception), you stated that you would respond in writing to the information I requested in order to review and process your personal day request.

As of today, I have not received the information. In the absence of the information, I will process Friday, December 8, 2000 as a personal day per your request based on my understanding that you are of the Episcopal faith and that the requested day is a designated Feast Day in the Episcopal calendar.

(Id. at Ex. S.).

On January 3, 2001, teacher Serena Sze filed a Request for Excused Absence for January 24, 2001, pursuant to Article XVIII(E), identifying the request as for "Title VII—Chinese New Year." (Id. at Ex. T.) On or before January 12, 2001, in response to an inquiry by Lynch, Sze provided a signed note indicating that she was of the Buddhist faith and that Chinese New Year was their most spiritual day, a day spent honoring and worshiping ancestors through prayer and meditation; and that the day was comparable to Christmas. (Id. at Ex. U.) In a memo dated January 12, Niedzielski, on behalf of the District, granted Sze's January 3, 2001 request. Niedzielski wrote: "It is my understanding from the information provided that you are of the Buddhist faith and that January 24, 2001 (Chinese New Year, Nian) is the most spiritual day in the Chinese calendar." (Stip. of Agreed Facts at Ex. V.)

On or before January 17, 2001, District teacher Lloyd Blauner filed a Request for Excused Absence for March 1, 2001, identifying the request as for "Title VII C.R.A. Accommodation (Saints David's day)." By memo of January 17, 2001, Niedzielski asked Blauner: "Please provide me with information explaining how the observation of your religious belief or faith precludes or interferes with your employment during working hours on the date for which you are requesting Title VII C.R.A. accommodation." (Id. at Ex. X.)

On February 12, 2001, Blauner wrote to Niedzielski that "Saints David's Day (Saints David's feast [sic] Day) has been and continues to be a day of very deep significance, in both the religious and cultural sense, to the people of Whales [sic] and people of Welsh ancestry. My observation of Saints David's Day will involve personal meditation, reflection, and other personal acts, which are appropriate to this very significant day." (Id. at Ex. Y.) On February 15, 2001, Niedzielski granted Blauner's request.

## 5. This Action

Plaintiffs seek (1) a declaratory judgment that defendants may not make an inquiry into the practices and beliefs of a particular religion for the purpose of determining whether there is a conflict between a professed religious practice and working hours; and (2) a permanent injunction to prevent defendants from engaging in such inquiries in the future.

They concede that the District is constitutionally permitted to ask them whether they hold a sincere religious belief requiring observance of a particular policy. However, according to plaintiffs, the District is not limiting itself to questions about the sincerity of plaintiffs' religious beliefs. In plaintiffs' view, the District first inquires about "formal religious prac-

tices of an applicant's organized religion." Only if the District sees no conflict between those practices and working hours does it proceed to make inquiry about the sincerity of the teacher's proffered beliefs. (Stip. of Agreed Facts at 24.)

Plaintiffs further argue that this bifurcated process has the effect of favoring selected "organized" religious practices by sending the message that teachers who belong to organized religions are presumed to be sincere in their beliefs, while all others must demonstrate sincerity. Specifically, they charge that when a teacher submits a Title VII Request for Excused Absence based upon religious conviction, the School District makes an inquiry concerning the practices and observances of the requesting teacher's religion, and bases its determination upon the administration's understanding of such practices and observances. Plaintiffs do not point to any instance in which a member of a religion that is not "organized" (their word) was denied accommodation for religious observances.

It is important to note what plaintiffs do not do. They do not seek damages under 42 U.S.C. § 1983 for the pre–2000 refusal to grant them Title VII accommodation. And because they have not been denied post–2000 accommodation, they do not request any specific relief with regard to those instances. They seek only to have the existing policy stricken as unconstitutional.

Defendants respond that: (1) this Court lacks subject matter jurisdiction over the plaintiff's claims under Article III of the United States Constitution, as the issues raised by the First Amended Complaint have been rendered moot, and the plaintiffs lack standing to pursue the claims set forth in the First Amended Complaint; (2) the underlying issue is purely a matter of the CBA which contains a broad arbitration clause; and (3) the inquiry engaged in

by the District neither violates the rights of its employees under Title VII (or the NYHRL), nor constitutes an excessive entanglement of the District in religion.

Plaintiffs and defendants cross-move for summary judgment.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. While Plaintiffs need not produce direct evidence of an alleged civil rights violation, they must be able to produce evidence, in admissible form, that is more than surmise and speculation which is based on their own subjective beliefs. *See Matsushita*, 475 U.S. at 576, 106 S.Ct. 1348.

### 1. *Plaintiffs Lack Standing to Sue*

The Court need not—indeed, cannot— reach the merits of the First Amendment

claim because plaintiffs do not have standing to bring this suit.

■ Article III of the U.S. Constitution requires that a "case" or "controversy" be present in order to confer jurisdiction on federal courts for a particular claim; standing to sue is an essential component of that requirement. *See Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The party seeking to invoke the jurisdiction of the court bears the burden of establishing that he has met the requirements of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). " '[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant....' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326 (2d Cir.1997). The keystone for determining injury in fact is the requirement that it be distinct and palpable—and, conversely, that it not be "abstract" or "conjectural" or "hypothetical." *Jaghory,* 131 F.3d at 329 (citations omitted). This injury must be " 'fairly ... trace[able] to the challenged action of the defendant....' " *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136 (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)). Finally, the injury must be one likely to be " 'redressed by a favorable decision.' " *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136 (quoting *Simon,* 426 U.S. at 38, 43, 96 S.Ct. at 1924, 1926).

■ A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement, but must show a likelihood that he or she will be injured in the future. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In *Lyons,* the plaintiff sought declaratory and injunctive relief against the Los Angeles police because he claimed that he had been illegally choked by Los Angeles police officers. *Id.* at 98, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675. Although he alleged that the Los Angeles police routinely applied choke holds and that he faced a threat of being illegally choked again in the future, the Supreme Court held that plaintiff's allegations of future injury were too speculative and dismissed the case for lack of standing. *Id.* at 109–11, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675. The Supreme Court concluded that in order to allege standing, Lyons would need to establish "(1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, ... or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 106, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675.

Plaintiffs argue that a party may have standing to seek equitable relief if he is injured by an official policy that is likely to cause recurring injury, citing *Deshawn v. Safir,* 156 F.3d 340, 343 (2d Cir.1998). In *Deshawn,* plaintiffs were children who had been arrested on possible delinquency charges, and summoned to appear before police officers for interrogation. Plaintiffs claimed that the police interrogations were so coercive that they violated their rights under the Fifth and Fourteenth Amendments. *Id.* On the question of whether the plaintiffs had standing to bring suit for equitable relief, the Second Circuit distinguished the facts of that case from *Lyons,* noting that in *Lyons,* there was no proof of

a pattern of illegality because the police had discretion to decide if they were going to apply a choke hold, and there was no formal policy which sanctioned the application of the choke hold. In contrast, the challenged interrogation methods in *Deshawn* were officially endorsed policies; as a result, there was a likelihood of recurring injury because the police activities are authorized by a written memorandum of understanding between the Corporation Counsel and the Police Commissioner. *Id.*

■ Here, the plaintiffs make no showing that the existing policy is likely to cause them recurring injury. Indeed, plaintiffs have stipulated that the District has given them all the leave they have requested since the new policy was implemented. To the extent that they base their claim on speculation that they may be denied similar leave in the future, they obviously run afoul of *Lyons*. And to the extent that they contend that persons who profess a faith other than theirs may be injured by some hypothetical application of the policy, they not only speculate, but they make it clear that they would not suffer any personal harm from defendants' behavior.

■ Even if plaintiffs could show with absolute certainty that they would again apply for a Title VII accommodation, and again be subject to questioning from the District, they would not suffer any constitutional injury. Plaintiffs concede that the district is constitutionally permitted to inquire into whether they have a good faith belief in the need to take a day off for religious observance. *See, e.g., United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (holding that when an individual asks for a draft exemption on religious grounds, the local draft board and the Court are permitted to "decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things,

religious"). While the state is not permitted to assess the objective accuracy of an applicant's beliefs, it may consider whether the beliefs are sincerely held. *See Jackson v. Mann*, 196 F.3d 316 (2d Cir.1999); *Philbrook v. Ansonia Board of Educ.*, 757 F.2d 476, 481 (2d Cir.1985) ("[A] sincerity analysis is necessary in order to differentiat[e] between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud").

In *Jackson,* a black prisoner sought kosher meals in prison, claiming to be of the Jewish faith. The prison rabbi concluded that plaintiff was not Jewish because "a Jew is one who was born Jewish or has formally converted." *Id.* at 320. The District Court granted summary judgment to the prison officials because plaintiff had not produced any proof that he was a Jew according to the practices of the Jewish religion. The Second Circuit remanded the case to the district court to determine the sincerity of plaintiff's beliefs, holding that the district court's reasoning "erroneously substituted the objective 'accuracy' of [plaintiff's] assertion that he is Jewish for the correct test—whether [plaintiff's] beliefs are 'sincerely held.'" *Id.* In considering plaintiff's sincerity, the Second Circuit noted that plaintiff had submitted documentation sufficient to raise an issue of disputed fact as to the sincerity of his beliefs. This included listing his religious preference as Jewish; participating in kosher meal programs in several other correctional facilities; and showing that he had actually gone without food for several days to avoid eating non-kosher food. *Id.*

In *Patrick v. LeFevre*, 745 F.2d 153 (2d Cir.1984), the Second Circuit summarized the sincerity inquiry as follows:

Sincerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motiva-

tions and vigilantly separate the issue of sincerity from the factfinder's perception of the religious nature of the claimant's beliefs. This need to dissever is most acute where unorthodox views are implicated. There, the factfinder's temptation to merge sincerity and verity is as great as the need to guard against this conjugation.

*Id.* at 157.

In determining an individual's sincerity, the Second Circuit has found that the state may consider the length of affiliation with a certain religion, *see Patrick,* 745 F.2d at 153 (2d Cir.1984) (denying defendant's motion for summary judgment because in order to determine whether plaintiff's beliefs "are to be accorded first amendment protection, the factfinder must delve into the internal workings of [plaintiff's] mind and assess the credibility of his claims"), may evaluate whether the motivation for the belief was based on "religious training" or simply political considerations, *United States v. Kauten,* 133 F.2d 703 (2d Cir. 1943) (affirming conviction of "conscientious objector" who failed to report for induction to the military, concluding that his objections to reporting for military induction were based on philosophical and political considerations, rather than "religious training and belief"), and may review past situations in which plaintiff has identified himself as a member of a particular religion, *Jackson,* 196 F.3d at 320 (noting that defendant had long listed his religious preference as Jewish and that he had gone days without eating to avoid consuming non-Kosher food).

If such factors may be considered, it naturally follows that courts—or the government entity in question—are entitled to make a limited inquiry to elicit such information. After the change in policy in the case at bar, five teachers asked for a Title VII accommodation, all of whose requests were granted. The District made inqui-

ries of four of those teachers (Burke, Sattler, Sze and Blauner) before their requests were granted.

Upon Edmund Burke's October 13, 2000 application for a "Title VII Accommodation," without specifying the religious holiday, Niedzielski asked him for "additional information related to your request for that date so that I may review it with respect to the Title VII protected right." (Stip. of Agreed Facts. at Ex. P.).

On November 27, 2000, Edward Sattler filed a Request for Excused Absence for December 8, 2000, for the "Feast of Immaculate Conception." In response, Niedzielski asked Sattler: "What is your religion?" and "What are the religious requirements of the day?"

On January 3, 2001, Serena Sze applied for a Title VII Accommodation for the Chinese New Year. Defendant made an "inquiry" to Sze, the nature of which neither plaintiffs nor defendants explain. However, Sze responded that the Chinese New Year was the "most spiritual day" of the Buddhist faith, which suggests that the District inquired as to the religious basis for her request.

Finally, on January 17, 2001, Loyd Blauner filed a Title VII Accommodation for "Saint David's Day." Niedzielski wrote to Blauner and said: "Please provide me with information explaining how the observation of your religious belief or faith precludes or interferes with your employment during working hours on the date for which you are requesting Title VII C.R.A. accommodation." (Id. at Ex. X.)

In each of the cases cited above, the District has made a very limited inquiry into the sincerity of the applicants' beliefs. While artless, the questions do not cross the constitutional threshold to cause plaintiffs injury in fact. Recognizing that sinc-

erity analysis is "exceedingly amorphous," *Patrick,* 745 F.2d at 157, it is difficult for the Court to conceive of a less intrusive set of questions (perhaps with the exception of asking directly: "Are you sincere?") for the purpose of evaluating sincerity. To preclude the District's questioning about a religion's requirements, or how they might interfere with the work day, would render it defenseless in distinguishing between those beliefs that are held as a matter of conscience, and those which are animated by motives of deception and fraud. *Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476, 481 (2d Cir.1985). Therefore, even if plaintiffs could show beyond mere speculation that they would apply for a different Title VII day, and that the District would ask these questions to determine the sincerity of their beliefs, plaintiffs have failed to show injury in fact.

Because the plaintiffs lack standing to bring this lawsuit, this Court lacks subject matter jurisdiction to hear these claims.

CONCLUSION

Defendant's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied. This constitutes the decision and order of the Court. The Clerk is directed to close the case.